## 27560. ARMOUR & COMPANY *v.* GULLEY.

DECIDED SEPTEMBER 26, 1939.    REHEARING DENIED DECEMBER 18, 1939.

*A. S. Skelton,* for plaintiff in error.

*J. H. & Emmett Skelton, Carey Skelton,* contra.

GUERRY, J.  The plaintiff, Gulley, alleged that Armour & Company were engaged in the business of manufacturing and selling a certain product known as "Armour's Potted Meat," which was packed in cans containing three and one-half ounces, and that such cans were sold to retailers to·be resold by them in the original packages; that plaintiff purchased a can of said product from a retailer, and that in said can was a "quantity unknown to plaintiff, of impure, tainted, poisonous, deleterious, and unwholesome matter which was negligently permitted by defendant manufacturer to become mixed with the contents of the can." The plaintiff alleged further that he had theretofore been in good health; that he ate the contents of said can and within an hour became violently ill from food poisoning from the eating of such can of meat, with

resultant damage; that he had no reason to suspect such food was unfit for human use and that the same tasted and appeared to be wholesome and fit to eat; and that the defendant was negligent in permitting such food to be placed on the market and in allowing such harmful ingredients to become ingredients of such food.

The evidence of the plaintiff was that before this time he had been a perfectly normal man. He had had two attacks of appendicitis, the last of which being about four years before that time. He had dysentery on the Saturday before the Sunday he ate the potted meat, "but I didn't have it bad . . I had to go out three or four times, I don't know what caused that dysentery. . . I went out twice on Sunday before dinner. . . I don't know whether I got completely over it or not." He stated that on Sunday morning he ate a normal breakfast, and then for the noon meal he had ham, string beans, and chocolate pie. About an hour before dark he ate the can of potted meat and gave a little of it to two small boys. Within an hour he became very sick, first became thirsty, and when he sat down his legs drew up under him with pains in his stomach, head, and legs. About eight o'clock he was carried to a doctor and he was still suffering. The doctor gave him some medicine and a shot in the arm. He was carried home but got no better and another doctor was sent for and he was given apamorphia in the arm and after vomiting he went to sleep. He was weak and faint for several days and did not recover fully until nearly three weeks later. The doctor who treated him last said he found his stomach distended, his legs stiffened, and his tongue coated, and apparently "poisoned or something." Paralysis of the legs is one of the symptoms of food poisoning as well as are diarrhœa and distension of the bowels.

This doctor, a witness for the plaintiff, testified that "distension of the bowels is caused by the formation of gases from eating any food that might go through a process of fermentation." A healthy man eating normal foods is not likely to have a distension. He said further: "It is possible if you are in a bilious condition eating any food that is prepared in a wholesome manner, free from taint and putrefaction, when taken into the stomach under those conditions would produce the same situation in which I found Mr. Gulley." He stated further that he could not say that the eating of the potted meat was a contributing factor of Mr. Gulley's con-

dition; it was possible that a general toxic condition would have caused it. In answer to the direct question propounded by counsel for plaintiff, "If the plaintiff in this case, Mr. Gulley, ate a normal dinner at the noon hour, such as beans, meat, and some chocolate pie, and the other members of the family ate the same food, but the other members of the family did not eat any potted meat, and the other members of the family did not get sick from the noon meal, and the plaintiff, after the noon meal, ate the potted meat and got sick, and was sick after the noon meal six or seven hours, which would you say caused the poisoning?" The doctor answered: "It could have been the condition of the stomach had something to do with it. You see cases in families who eat the same diet and some get sick and some do not; the condition of the patient has something to do with it. I could not say whether it was attributable in part to the noon meal or the later eating of the potted meat as the cause of the condition."

There was no evidence of anything unusual about the meat the plaintiff ate which would cause him to suspect that there was anything wrong with it; it appeared normal in every way. The grocer who sold the can to the plaintiff testified that it was a part of a case containing forty-eight cans which he sold to various other customers, and he and his own family consumed eight or ten cans of it, and no other complaints were made. The defendant introduced testimony which, if credible, tended to show that in the selection of the animals and their preparation into food products, such as in this case, the greatest of care was used under government inspection and supervision, and that these cans which were sold to plaintiff were, after they were sealed, cooked for one and one-quarter hours under pressure at a temperature of 240 degrees Fahrenheit. An expert bacteriologist testified that no germs could live after having been subjected to such a temperature for fifteen minutes, and that if decomposition or deterioration had set in in such can before it was opened it would have evidenced itself, and that a can of meat which, when opened, appeared normal in every way, had not suffered from decomposition or disorder such as would cause sickness to a person eating the same.

In order to support a verdict in this case it is necessary that the plaintiff show that the defendant prepared and placed on the market food which when eaten would cause sickness, and that as a

result of his buying and eating such food he became sick. The preparation and sale of the potted meat were admitted. Defendant denied any negligence in the preparation of said food and alleged that the food was good and fit for human consumption. The evidence relied on .to support the verdict is the fact that the plaintiff ate the food and became sick. It is contended that the evidence is sufficient to show that the potted ham which he ate caused his sickness, and that it caused his sickness because it was unfit for a normal person to eat because it contained harmful and deleterious matter. The food being in an original package, if it was shown that it was harmful and contained impurities likely to cause sickness, the defendant would be liable for resultant injury.

The plaintiff failed entirely to show by any direct evidence that the food contained any harmful, impure, or deleterious substances. On the contrary the defendant showed by direct evidence the manner in which the food was prepared and the care used, and that if there were any defects because of bacteria and the like they would be evidenced by the condition of the food when opened. The plaintiff, if his verdict is to be supported by any evidence, must rely on the doctrine of "res ipsa loquitur." Our courts in *Castleberry* v. *Atlanta, 74 Ga.* 164, have said: "The jury have a right, in arriving at a verdict to make inferences from the facts proved." Judge Bleckley in *White* v. *Hammond, 79 Ga.* 182, 185 (4 S. E. 102), said: "In construing and applying testimony, reasonable inferences and deductions may be made, and conclusions may be reached that lie quite beyond the mere letter of the evidence." This principle has been codified in section 38-123. "In arriving at a verdict, the jury, from facts proved, and sometimes from the absence of counter evidence, may infer the existence of other facts reasonably and logically consequent on those proved." In *Cockrell* v. *Langley Mfg. Co., 5 Ga. App.* 317, 322 (63 S. E. 244), this court said: "the doctrine is simply a rule of circumstantial evidence which permits an inference to be drawn from proved facts."

An extensive discussion of the cases involving the principle is found in *Macon Coca-Cola Co.* v. *Crane, 55 Ga. App.* 573 (190 S. E. 879). It has been applied to actions similar to the present case where it was relied on to support the allegations as to the negligence of the defendant. *McPherson* v. *Capuano, 31 Ga. App.* 82 (121 S. E. 580), is cited and relied on by the defendant in error in this

case. It was there said: "Proof by one claiming to have been injured by eating food furnished to him . . merely that he ate the food and in consequence became sick, would not, without more, establish the averment that the food was unwholesome," yet where there was additional evidence as to the time when he had eaten other food, and his physical condition, and also testimony from physicians which "would have authorized the inference that the sudden illness was caused by the eating of the sandwich, *which, as the jury could have found from the testimony of another physician, would not have produced the illness if the sandwich had been wholesome* [italics ours], such evidence was sufficient to make a prima facie case . . against the defendant." It was said further: "Where the plaintiff *establishes the unwholesome quality* of the food, with injury from its consumption, these facts in themselves would sufficiently speak of the defendant's negligence to make a prima facie case." In *Copeland* v. *Curtis, 36 Ga. App.* 255, 256 (136 S. E. 324), this court said that where "*the unwholesome quality of the food* with injury from its consumption" was established the doctrine may be applied.

For every effect there must be a cause. The plaintiff was poisoned by something he ate. This fact is substantiated by his own testimony, the testimony of the doctors, and the circumstances of the case. He alleged that the cause of his poisoning was the potted meat sold to him by the defendant. In view of the facts that it had been several hours since he had eaten anything and that his sickness came about within an hour after he had eaten the potted meat, we may say that the jury was authorized to find that his sickness was caused by the meat he had eaten. This fact, in and of itself, does not warrant the conclusion that because he became sick from eating the meat, the meat itself was unwholesome and deleterious. His own evidence is that on the preceding day he had been suffering from dysentery. The doctor who was put up by the plaintiff testified that when a person's system is disarranged eating food prepared in a wholesome manner will sometimes cause the very condition in which "I found Mr. Gulley." This doctor refused to say that the meat caused the sickness, or that the fact of sickness after eating the meat necessarily meant that the meat was unwholesome.

We recognize the principle that although a defendant may by

his evidence show that under the system used it would be impossible for any deleterious matter to be and remain in its manufactured product, this evidence will be of no avail against direct evidence that the manufactured product did in fact contain harmful matter. *Payne* v. *Rome Coca-Cola Bottling Co.*, 10 *Ga. App.* 762 (73 S. E. 1087); *Martin* v. *Waycross Coca-Cola Bottling Co.*, 18 *Ga. App.* 226 (89 S. E. 495). If the plaintiff had shown by any direct evidence in this case that the potted meat sold him was unwholesome, harmful, and deleterious, the jury would have been authorized to disregard the testimony as to the care taken in the preparation of the meats. If the plaintiff had shown by direct evidence that the meat caused the trouble, and that, in turn, the sickness would not have occurred except for the decayed and unwholesome condition of the meat, the jury would have been authorized to return the verdict. He relied on an inference to be drawn from proved facts. Such inferences must measure up to the rule in civil cases laid down for the weighing of circumstantial evidence in civil cases. This rule is stated in *Georgia Railway & Electric Co.* v. *Harris,* 1 *Ga. App.* 714 (57 S. E. 1076) : "The testimony must be such as to reasonably establish the theory relied upon, and to preponderate to that theory, rather than to any other reasonable hypothesis." As was said in that case, page 717, "There exists a point where the inferences to be drawn can not, as a matter of law, be sufficient to support a verdict. . . The facts shown must not only reasonably support that conclusion, but also render less probable all inconsistent conclusions."

The fact that the sickness occurred after the eating of the meat may show that it happened "post hoc," but does not necessarily mean that it happened "propter hoc." Neither does the fact of eating the potted meat and then becoming sick establish the fact that the meat was unwholesome. In other words, the circumstantial evidence relied on in this case to show that the potted meat was unwholesome and deleterious was that the defendant became sick after eating the meat. Plaintiff's own evidence is that this sickness was as likely to happen because of the deranged condition of a person's stomach and the eating of wholesome food, as it was from unwholesome food. The circumstances relied on to support this verdict fail to preponderate to the theory that the sickness was caused by unwholesome food rather than to any other theory or

cause for the resultant condition, and we think the circumstantial evidence relied on fails to support the verdict.

"When the party upon whom the burden of an issue rests seeks to carry it, not by direct proof, but by inferences, he has not, in this reasonable sense, submitted any evidence for a jury's decision, until the circumstances he places in proof tend in some proximate degree to establish the conclusion he claims; and for this, the facts shown must not only reasonably support that conclusion, but also render less probable all inconsistent conclusions." *Georgia Railway & Electric Co.* v. *Harris, supra.*

It becomes unnecessary to consider the remaining assignments of error. The court erred in overruling the motion for new trial.

*Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*